UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSEPH ANTHONY SOTTASANTE,

               Plaintiff,

    v.

**DECISION AND ORDER**

1:15-CV-00419 EAW

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.

## I.    Introduction

Represented by counsel, Plaintiff Joseph Anthony Sottasante ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 7; Dkt. 10). For the reasons set forth below, the Commissioner's motion is denied, the Plaintiff's motion is granted in part, and the matter is remanded for further proceedings.

## II.    Factual Background and Procedural History

### A.    Overview

On September 22, 2011, Plaintiff filed an application for DIB (Administrative Transcript (hereinafter "Tr.") at 266-74). In his application, Plaintiff alleged that he had been disabled since September 1, 2011, due to osteoarthritis, hip replacements, combat-

- 1 -

related post-traumatic stress disorder ("PTSD"), severe eczema and related infections, high cholesterol, and high blood pressure. (Tr. 268, 342). Plaintiff's application was initially denied on November 29, 2011. (Tr. 129-40). Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 141-42). A hearing with ALJ Nancy G. Pasiecznik was scheduled for February 12, 2013. (Tr. 79-85). Plaintiff failed to attend. (*See* Tr. 81). Plaintiff appeared at a hearing before ALJ Pasiecznik on August 14, 2013. (Tr. 38-78). Vocational Expert ("VE") Esperanza DiStefano also testified at that hearing. (Tr. 74-78). A subsequent hearing was held in front of ALJ Donald T. McDougall after ALJ Pasiecznik became unavailable. (Tr. 86-119). Plaintiff testified via telephone. (Tr. 92-111). VE Ms. Dutton-Lambert also testified. (Tr. 111-18). Plaintiff's counsel was permitted to submit a post-hearing brief. (Tr. 9). The brief was filed on September 16, 2014. (Tr. 410-411). On September 25, 2014, ALJ McDougall issued a decision finding Plaintiff not disabled. (Tr. 9-30). The Appeals Council denied Plaintiff's request for review on March 13, 2015, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). Plaintiff commenced this action on May 11, 2015. (Dkt. 1).

**B.    The Non-Medical Evidence**

Plaintiff testified at two hearings before administrative law judges in connection with his application for disability. (Tr. 38-78; 86-119). Plaintiff was represented by counsel at both hearings. (Tr. 38; 88).

1.    **Plaintiff's Hearing Testimony Before ALJ Pasiecznik**

The first hearing was before ALJ Pasiecznik on August 14, 2013. (Tr. 38-78). The ALJ stated that Plaintiff's alleged onset date was September 1, 2009.[1] (Tr. 40). She also noted that Plaintiff's last insured date was June 30, 2011, and that the evidence would have to establish that Plaintiff was disabled before that date. (Tr. 40).

Plaintiff was examined by both ALJ Pasiecznik and his attorney. (Tr. 44-74). Plaintiff first testified that he was living in Pennsylvania, but planned to return to Buffalo, New York in late August or early September 2013. (Tr. 44-45). Plaintiff was living in Pennsylvania because he was on probation. (Tr. 45). Plaintiff was not working at the time, and had not worked since August 2008. (Tr. 45-46).

Plaintiff testified as to his various jobs prior to August 2008. (Tr. 46-55). Few of the jobs were long-term or full-time. (*See id.*) Plaintiff testified that, in 2007, he had worked resurfacing concrete floors, which required him to lift up to 50 pounds and use power tools. (Tr. 46-48). In 2005, Plaintiff had a position detailing cars, which required him to lift and carry up to 20 pounds. (Tr 48-49). In 2004, Plaintiff worked a temporary assignment in a garage organizing the tools, machine shop, and tire shop. (Tr. 50). In that role, he had to lift up to 75 pounds. (*Id.*). In 2003, Plaintiff worked as a "soil remediation specialist" cleaning up oil spills. (Tr. 50-51). He used heavy equipment, like backhoes and front-end loaders, to move the soil. (Tr. 51).

Plaintiff testified that, in 2000, he drove a delivery truck and a delivery van. (Tr. 51-53). In those roles, he was required to lift up to 40 pounds. (Tr. 53). In 1999,

---

[1]    The alleged onset date was later amended to December 1, 2008. (Tr. 10).

Plaintiff installed seamless gutters and windows, which required him to lift up to 50 pounds. (*Id.*). In both 1998 and 2000, Plaintiff worked as a roofing technician. (Tr. 49). In that role, he "ripped off old roofs and installed new roofs," made roofing repairs, and installed gutters, siding, and windows. (*Id.*). He was required to lift up to 75 pounds and climb ladders. (*Id.*). In 1997 and 1998, Plaintiff had a job with a fire restoration company cleaning out debris and reframing walls after a fire. (Tr. 54). Finally, at various times Plaintiff sold automobiles for his uncle, and worked as a hazardous material handler. (Tr. 54-55).

ALJ Pasiecznik also asked Plaintiff about Plaintiff's "pension" from the Department of Veterans Affairs ("VA"). (Tr. 56-57). Plaintiff testified that he was not receiving a pension from the VA, but that he was receiving service-connected disability pay. (Tr. 56). The VA had evaluated him as having 100 percent total impairment. (Tr. 57).

Plaintiff was then questioned by counsel. (Tr. 57-71). Plaintiff testified that he would no longer be able to do his previous jobs because he would have difficulty lifting anything more than 10 to 15 pounds due to chronic pain in his hips, back, and neck. (Tr. 57-58; 63) Plaintiff later stated that he could lift an object of 20 pounds three or four times in a day. (Tr. 62). Plaintiff noted that his pain had been that way for "over a year" and that his "health ha[d] gotten worse in the last three to four years because of [his] hips and the joint disease." (Tr. 58). He reported an average pain of five or six out of ten, with higher pain at times. (Tr. 64).

He stated that he could not walk long distances or bend over, and he had to switch positions between sitting and standing every half hour. (Tr. 59). Plaintiff testified that he could not walk more than two or three blocks at a time, and that he used a cane. (Tr. 60). He also stated that he could not stand for more than 15 minutes at a time without experiencing pain. (Tr. 61-62). Cold, damp, or rainy weather exacerbated Plaintiff's pain. (Tr. 63). Plaintiff stated that he had tried physical and occupational therapy, medication, and dietary changes to reduce his pain. (Tr. 65).

Plaintiff testified that he had a one-inch leg length discrepancy and usually wore a lift in his shoe. (Tr. 59). Plaintiff's right hip was replaced at age 35, and the VA had suggested that he have the other hip replaced due to his leg length discrepancy. (Tr. 60).

Plaintiff reported that he had experienced numerous bone fractures throughout his life, including in his right arm, left wrist, collarbone, both ankles, left leg, a vertebrae in his back, C3 in his neck, and his tailbone. (Tr. 64). He had torn his rotator cuff as well. (*Id.*).

Plaintiff also testified that he was suffering from combat-related PTSD and an anxiety disorder. (Tr. 58). Plaintiff served in the military as a paratrooper, truck driver, and chemical, nuclear, and biological specialist. (Tr. 68-69). Plaintiff stated that he avoided shopping malls and large crowds due to his PTSD. (Tr. 69-70). He claimed that he felt as if he had been experiencing PTSD for 20 years. (Tr. 70). Dreams and memories of his combat tours triggered feelings of disquiet. (Tr. 70-71).

Plaintiff also spoke about his history of drug and alcohol abuse. (Tr. 66-69). Plaintiff had entered drug and alcohol treatment with the VA "several times." (Tr. 66).

Plaintiff testified that he had been clean from 2007 until early 2011, but had relapsed in February 2011. (Tr. 66-67). "People, places, and things" could trigger a relapse due to Plaintiff's PTSD. (Tr. 68). Plaintiff said that he "would drink [himself] to sleep so [he] wouldn't dream." (*Id.*).

ALJ Pasiecznik questioned Plaintiff about his day-to-day activities. (Tr. 72). Plaintiff stated that in a typical day he met his brother for breakfast and then did "a little bit of running around with him." (*Id.*). Plaintiff also routinely drove to see his two teenage daughters. (*Id.*).

### 2.    Vocational Expert DiStefano's Testimony

VE DiStefano testified at the August 14, 2013 hearing. (Tr. 74-78). VE DiStefano noted the DOT code number, exertional requirement, and skill level for each of Plaintiff's past jobs. (Tr. 75-77). The evidence was admitted without objection. (Tr. 77). ALJ Pasiecznik did not pose any hypotheticals to VE DiStefano during the hearing because the ALJ intended to give Plaintiff an opportunity to submit a brief before doing so. (*See* Tr. 77-78).

### 3.    Plaintiff's Hearing Testimony before ALJ McDougall

Plaintiff testified at a second hearing via telephone, this one before ALJ McDougall, on August 18, 2014. (Tr. 88-119). Plaintiff's counsel and VE Dutton-Lambert also attended the hearing. (Tr. 88).

Plaintiff testified that he had completed high school and one year of post-secondary education. (Tr. 92). He also stated that he had stopped working in October 2008 because of problems associated with his hips, legs, and PTSD. (Tr. 92-94).

ALJ McDougall questioned Plaintiff about his hip pain and leg length discrepancy. (*Id.*). Plaintiff said that his right hip had been replaced and the left needed replacement as well. (Tr. 93). The first hip replacement exacerbated Plaintiff's leg length discrepancy because, according to Plaintiff, the doctors had "elongated [his] leg to hold the prosthesis in place." (Tr. 94).

The ALJ also asked about Plaintiff's claimed PTSD. (*Id.*). Plaintiff testified that he had been diagnosed with PTSD in 2002, and had been treated by the VA since 2007. (Tr. 95). Plaintiff had also been treated at the VA for drug and alcohol abuse. (*Id.*). He reported relapses in November 2011 and December 2013. (Tr. 96). Those relapses violated Plaintiff's probation conditions. (Tr. 96-97).

Plaintiff stated that he had received in-patient treatment for PTSD by the VA in 2008 and 2012, and had "ongoing outpatient treatment since then." (Tr. 98). He also noted "a couple psychiatric admissions" for PTSD and depression, including one in February 2014. (Tr. 99-100). Plaintiff said that he had not had any treatment for PTSD after his February 2014 admission because he was incarcerated. (Tr. 101). Plaintiff was taking Remeron and Propranolol for PTSD. (Tr. 102). The Remeron helped Plaintiff sleep through the night, but did not adequately deal with his "intrusive thoughts." (Tr. 110-11). Before taking Remeron, Plaintiff's sleep was "sporadic." (*Id.*).

ALJ McDougall also questioned Plaintiff about Plaintiff's physical limitations. (Tr. 103-05). Plaintiff stated that he could walk one or two city blocks at a time before feeling pain in his back and gluteal region. (Tr. 103-04). Plaintiff could not stand for more than "a couple minutes" at a time without sitting down and elevating his legs, which

he did three to four times per day for 10 to 15 minutes. (Tr. 104; 109).  Plaintiff also testified that he could not sit in a chair for more than 15 minutes.  (Tr. 104-05).  He reported that he could lift 10 pounds "easily," but had not attempted to lift more than that.  (Tr. 105).  Later, Plaintiff said that he had trouble ascending and descending stairs.  (Tr. 109).

ALJ McDougall confirmed that Plaintiff had been convicted of burglary and domestic violence in Pennsylvania.  (Tr. 106).  The ALJ then stated that Plaintiff's disability rating with the VA had been "up and down," that "[h]e was at about a 30 to 40 percent" in 2008, but was at 100 percent at the time of the hearing.  (Tr. 108).

### 4.    Vocational Expert Dutton-Lambert's Testimony

VE Dutton-Lambert also testified during the hearing on August 18, 2014.  (Tr. 111-18).  ALJ McDougall asked the VE whether there were jobs in the national economy for a person limited to light work, who: had to change positions every half hour; could not work on stairs, ramps, or heights; could not interact with the public; could have no more than occasional contact with supervisors, and frequent contact with co-workers and peers; could only occasionally balance, stoop, kneel, crouch, or crawl; and could not work with heavy machinery.  (Tr. 114).  VE Dutton-Lambert stated that there were such jobs available, as a small parts assembler (228,000 positions nationally, 1,600 locally), and "an inspector, hand packager" (131,600 positions nationally, 1,200 locally).  (Tr. 114-15).

In another hypothetical, Plaintiff's counsel asked whether there were jobs in the economy for a similar person who had an additional requirement that they elevate their

legs three to four times per day for 10 to 15 minutes. (Tr. 116). The VE stated that there were no such jobs. (*Id.*).

In response to additional questions by Plaintiff's attorney, the VE also testified that an individual could be off-task no greater than 15 percent of the workday, and that an employee could be absent no more than two days per month after their introductory period on the job. (Tr. 117-18).

### C.    Summary of the Medical Evidence

The Court assumes the parties' familiarity with the voluminous medical evidence in this case. Therefore, only a brief summary is necessary.

### 1.    Medical Evidence Before Alleged Onset Date

Plaintiff underwent a right hip replacement in 2002. (Tr. 468). Plaintiff has had complaints relating to right knee pain since at least 2003. (*Id.*). A 2003 x-ray of the right knee showed no fracture or dislocation, and the "joint space [was] well maintained." (Tr. 440).

Plaintiff has been assessed as having mental health issues and accompanying alcohol dependence and drug abuse since at least 2002. (Tr. 458-61). Plaintiff started using cocaine as early as 1995, and opiates in 2001 or 2002. (Tr. 670). He was admitted to the Coatesville, Pennsylvania VA facility for cocaine dependence and PTSD symptoms in December 2006. (*Id.*). Plaintiff's PTSD grew out of combat deployments in Saudi Arabia during Operation Desert Storm, and manifested in nightmares, anxiety, and depression. (Tr. 461).

## 2.   Medical Evidence Between Alleged Onset Date and Date Last Insured

On January 4, 2007, Plaintiff was denied admission to an in-patient PTSD program because he had few symptoms of PTSD and had made no use of outpatient treatment options.   (Tr. 637).   On July 21, 2008, Plaintiff was diagnosed with "moderately severe depression," and referred to a care manager.  (Tr. 628-29).

Plaintiff was admitted to the Substance Abuse Treatment Unit at the Coatesville VA facility in both July and August 2008, pursuant to a court order.  (Tr. 465-67; 475; 539; 587).   On admission in July 2008, an evaluation described Plaintiff as suffering from PTSD symptoms.  (Tr. 592).   At the time of the August 2008 admission, Plaintiff denied having any symptoms of PTSD.  (Tr. 539).   Plaintiff transferred to a VA domiciliary program in August 2008.  (Tr. 504).   After transfer, Plaintiff described "mild" symptoms of PTSD.  (*Id.*)   During the domicilary program, Plaintiff had x-rays of both hips, which showed the right hip replacement and "no significant degenerative changes of the left hip."  (Tr. 438).   Plaintiff was discharged "irregular" from the program on September 17, 2008, because he was "marginally motivated for treatment" and had unauthorized absences.  (Tr. 454; 475).   His Global Assessment of Functioning ("GAF") score was 50.  (Tr. 453).

Plaintiff attended group counseling for drug addiction on December 4, 2008, December 12, 2008, and January 22, 2009.  (Tr. 430-32).   He was noted to be clean and sober at those meetings.   (*Id.*).   Plaintiff stopped appearing for therapy sessions in

February 2009. (Tr. 429). Plaintiff reported a substance abuse relapse in June 2009. (Tr. 474).

On February 22, 2010, Plaintiff started treatment with Sheila Donovan, Ph.D., after relocating to Buffalo, New York. (Tr. 1442). Plaintiff reported to Dr. Donovan that he stopped using drugs and alcohol after December 2009, and that he was staying in a shelter but seeking housing. (Tr. 1442-43). Plaintiff exhibited a GAF score of 55. (Tr. 1443).

At his March 22, 2010, follow-up appointment with Dr. Donovan, Plaintiff reported staying at a VA residential facility and was considering participating in a work-study program before starting school later in the year. (Tr. 1430-31). Dr. Donovan diagnosed PTSD and a GAF of 55. (Tr. 1431).

On April 1, 2010, Plaintiff discussed vocational assistance with Vocational Rehabilitation Specialist Thomas Sullivan. (Tr. 1425). Plaintiff stated that he had "no physical barriers to employment at this time." (*Id.*).

At Plaintiff's April 5, 2010, follow-up appointment, Dr. Donovan noted no abnormalities in Plaintiff's mental status examination findings. (Tr. 1422). Plaintiff said that he was bored "as he [was] not working." (*Id.*). On April 22, 2010, Dr. Donovan reported the same mental status examination findings, and observed that Plaintiff was excited to begin work the following week. (Tr. 1416-17). Plaintiff's sleep problems had worsened, and he reported that he was having nightmares due to regret for things he did while under the influence of drugs and alcohol. (Tr. 1417). Plaintiff was diagnosed with PTSD and a GAF score of 55. (Tr. 1417-18).

On April 26, 2010, Sullivan completed admission paperwork for Plaintiff to participate in compensated work therapy. (Tr. 1413-15). Plaintiff reported that a competitive job was his ultimate employment goal. (Tr. 1414).

On April 29, 2010, Plaintiff sought treatment from Celene Cannon-Tinder, a nurse practitioner, for right hip pain after increased activity and "working up on the 6th floor." (Tr. 1409-10).

Plaintiff met with Dr. Donovan again on June 4, 2010. (Tr. 1403-04). Plaintiff reported increased anxiety due to his position as a resident assistant at his housing facility. (Tr. 1403). Plaintiff stated that at one point he had to be physically restrained because he believed another resident had stolen from him. (*Id.*). Dr. Donovan noted that Plaintiff hoped to manage his anxiety and anger, and to move out of the VA facility. (*Id.*). Plaintiff had a GAF score of 55. (Tr. 1404).

Plaintiff missed curfew for his residential facility on June 14, 2010. (Tr. 1401). At his June 24, 2010, appointment with Dr. Donovan, Plaintiff acknowledged that he should not have broken curfew, expressed frustration with the group living arrangements, and stated that he intended to find his own apartment in July. (Tr. 1383-85). Dr. Donovan noted "ongoing progress toward[s] recovery goals, including returning to school/employment . . . ." (Tr. 1383). Dr. Donovan also stated that Plaintiff should be evaluated for PTSD, and diagnosed rule out PTSD. (Tr. 1384). Plaintiff had a GAF score of 60. (*Id.*).

Plaintiff met with Michelle McClellan, Ph.D. on June 21, 2010.  (Tr. 1387-97). Plaintiff was diagnosed with PTSD, and had a GAF score of 58.  (Tr. 1397).  Plaintiff was "committed to treatment and ha[d] positive relationships in his life."  (Tr. 1390).

Plaintiff's last day of work therapy was August 13, 2010, and he was noted to have performed well while working.  (Tr. 1377).  Plaintiff was interested in continuing working while attending classes.  (*Id.*).  On August 26, 2010, Sullivan summarized Plaintiff's participation in the compensated work therapy program, noting that Plaintiff had completed 32 seven-hour workdays during the program, was "capable of competitive employment," but was not interested in employment.  (Tr. 1373-76).

On November 18, 2010, Plaintiff reported cervical neck pain after "recently shooting [a] shot gun, and since that time, [had] not been able to turn neck side to side without having a 'cracking sound and feeling.'"  (Tr. 1365).  X-rays revealed a slight motion artifact on the lateral projection; moderate degenerative disc disease at C4-C5, C5-C6, C6-C7; and bilateral intervertebral foramina narrowing at right C4-7 and left C5-7.  (Tr. 828).

On December 28, 2010, Plaintiff called the VA to request an appointment for complaints of "cervical neck pain and crackling" without any recent injury or numbness or tingling.  (Tr. 1364).  Attempts to follow up with Plaintiff were unsuccessful.  (*Id.*).

Plaintiff sought treatment on March 10, 2011, for a sore throat and coughing.  (Tr. 1355-58).  Plaintiff's reported pain score was zero, and he had independent ambulation with a steady gait.  (Tr. 1356).

### 3.   Medical Evidence After Date Last Insured

On August 9, 2011, Plaintiff sought treatment for ongoing neck and back pain, and a rash. (Tr. 419). A physical examination of the neck produced no tenderness, a mildly decreased range of motion laterally to the left, and full range of motion to the right, in flexion, and in extension. (Tr. 420). Plaintiff's back and extremities were normal. (*Id.*).

Plaintiff met with Cannon-Tinder on August 9, 2011, reporting neck pain of 5/10. (Tr. 1330). On September 20, 2011, Plaintiff saw Licensed Clinical Social Worker Tricia Masecchia. (Tr. 1325-29). Plaintiff showed no evidence of psychosis. (Tr. 1326). Masecchia noted that Plaintiff's claims for PTSD had been denied four times. (*Id.*). Masecchia diagnosed an anxiety disorder and rule out PTSD. (Tr. 1327). Plaintiff's GAF score was 55. (*Id.*).

On October 24, 2011, Plaintiff met with Vocational Rehabilitation Specialist April Melancon for vocational rehabilitation intake, who noted that Plaintiff needed "activity to meet parole requirements while waiting to attend college." (Tr. 1322-25). In response to Ms. Melancon's question regarding physical limitations, Plaintiff responded, "not really." (Tr. 1324).

On November 2, 2011, Plaintiff saw Syed Ahmed, M.D., complaining of nightmares and insomnia. (Tr. 1292). Plaintiff reported symptoms that had "recently increased." (*Id.*). Plaintiff did not like spending time in crowded places and made sure to keep his "back covered" when in public. (*Id.*). He was "a suspicious person" and did not trust anyone. (*Id.*). Dr. Ahmed diagnosed Plaintiff with an anxiety disorder and rule out PTSD. (Tr. 1293).

On December 5, 2011, Plaintiff underwent a VA disability benefits examination. (Tr. 1262).   On examination, Plaintiff's right ankle motion was normal; his left was moderately reduced.   (Tr. 1273-75).   Plaintiff was noted not to require a cane or other assistive device, and his ankle condition did not interfere with his ability to work.   (Tr. 1279; 1281).   An ankle x-ray the same day showed no abnormalities.[2]   (Tr. 827-28).

Hip x-rays on February 8, 2012 showed that the left hip joint had "minimal degenerative sclerotic change . . . ."   (Tr. 827).   Cannon-Tinder also issued Plaintiff a straight cane that day.   (Tr. 1238).   Cannon-Tinder interpreted the x-rays as showing Plaintiff was "a candidate for pain meds, crutches, PT," and a cortisone injection.   (Tr. 1240).

Dr. Mohammad Saeed evaluated Plaintiff on February 15, 2012.   (Tr. 1232-34).   At the time, Plaintiff was rated 30% disabled by the VA.   (Tr. 1232).   Plaintiff again noted that he had been denied disability by the VA for PTSD four times.   (Tr. 1233).   Dr. Saeed assigned Plaintiff to a PTSD clinic.   (Tr. 1234).

Plaintiff went to the emergency room, complaining of left hip pain, on February 17, 2012.   (Tr. 1225).   Plaintiff's cane and leg length discrepancy were noted.   (Tr. 1226).   Plaintiff was diagnosed with chronic hip pain with a possible avulsion fracture, and prescribed Lortab.   (Tr. 1227).

On March 5, 2012, Plaintiff requested a psychiatric admission to the VA hospital for "anger issues," and was admitted for PTSD.   (Tr. 1193-97).   Plaintiff admitted a

---

[2]    The record is unclear whether the x-ray was on the right or left ankle.   (*See* Tr. 827-28).

substance abuse relapse. (Tr. 1204). Plaintiff also stated that he had "been experiencing a worsening of symptoms related to his PTSD." (*Id.*). Plaintiff was worried that his anger issues would cause him to harm his wife. (Tr. 1205). Plaintiff was diagnosed, because of his history, with PTSD, and alcohol and cocaine addiction. (Tr. 1206). The following morning he had a GAF score of 35. (Tr. 1169).

On March 13, 2012, Licensed Clinical Social Worker Jennifer Walton conducted a treatment plan review. (Tr. 1029-31). Walton noted Plaintiff's PTSD and alcohol abuse. (Tr. 1030). Plaintiff attended daily substance abuse treatment from March 13, 2012 until March 29, 2012. (Tr. 1043-88).

Plaintiff met with Walton again on April 4, 2012, and reported that he had been incarcerated because he broke a window after a verbal argument with his wife. (Tr. 1026-27). On April 6, 2012, Plaintiff followed up with Judith Hyatt, Pharm.D., to discuss medication for PTSD symptoms. (Tr. 1021). Dr. Hyatt increased Plaintiff's dose of Prazosin, and continued Mirtazapine. (Tr. 1022). Dr. Hyatt's mental status exam noted that Plaintiff was depressed and irritable. (*Id.*).

Walton interviewed Plaintiff again on April 10, 2012. (Tr. 1020). Plaintiff was encouraged to engage in anger management counseling, which he agreed to attend. (*Id.*).

On April 12, 2012, Plaintiff saw Cannon-Tinder. (Tr. 995). He reported his recent hospitalization, and chronic left hip pain. (*Id.*). Plaintiff was staying active by "walking his dog," hunting, and fishing. (Tr. 996). A "recent" CT scan had shown "mild degenerative changes in the [left] hip." (Tr. 998). Plaintiff was told to use Motrin unless he felt "breakthrough" pain, in which case he should use Hydrocodone. (*Id.*).

Plaintiff was again admitted to in-patient treatment from May 8, 2012 until May 22, 2012, because he needed "some peace" and "to work on [his] anger." (Tr. 848-49). According to Allison Trusso, M.S., Plaintiff was motivated to get treatment, but it was noted that his mental health issues were more related to the effects of substance abuse, legal issues, and relationship concerns than PTSD. (Tr. 850). "[U]pon initial assessment it was not immediately clear that [Plaintiff] was presenting with [the] full range of PTSD symptoms . . . ." (*Id.*). The distress was mainly "anger, anxiety and depression resulting in a primary Axis 1 diagnosis of Adjustment Disorder with mixed anxiety and depressed mood." (*Id.*). A diagnosis of rule out PTSD was given because Plaintiff reported traumatic incidents during his combat tours. (*Id.*). Trusso stated Plaintiff had a "preoccupation regarding service connected benefits." (*Id.*). Plaintiff was not recommended for further PTSD "Track II" treatment. (*Id.*).

Stacy DiMartino, M.D., met with Plaintiff during his hospitalization on May 9, 2012. (Tr. 953-54). In contrast to Trusso's evaluation that Plaintiff did not show the full spectrum of PTSD symptoms, Dr. DiMartino diagnosed Plaintiff with PTSD. (*See* Tr. 954). The record does not explain this difference of opinion.

On May 16, 2012, Plaintiff complained of hip pain and requested an increased dosage of Hydrocodone. (Tr. 907). His request was denied. (*Id.*). Plaintiff was issued a cane. (*Id.*).

Plaintiff was admitted to another in-patient treatment program on June 5, 2012. (Tr. 864). He was diagnosed with PTSD and substance abuse issues. (*Id.*). In a follow-up appointment with Dr. Saeed on June 16, 2012, Plaintiff reported fewer nightmares and

improved irritability. (Tr. 1552). On September 17, 2012, Plaintiff reported to Dr. Saeed

that he had received a 100% disabled rating with the VA. (Tr. 1528).

On January 25, 2014, a back x-ray revealed mild spondylosis and moderately

severe degenerative disc disease from C4-C7; minimal spondylosis and mild degenerative

disc disease at C3-4; and foraminal narrowing from C5-7. (Tr. 1614). A simultaneously

conducted hip x-ray revealed no change since Plaintiff's February 2012 x-ray. (Tr.

1615).

Plaintiff attended couples therapy with his wife on January 22, 2014, and January

29, 2014. (Tr. 1737-39; 1771-72).

Plaintiff reported "passive" feelings of suicide to Vanessa Tirone, a psychology

intern, on February 5, 2014. (Tr. 1734). He stated "sometimes I think I should just go to

Niagara Falls and just end it." (*Id.*).

Plaintiff was admitted to the VA hospital again on February 11, 2014, after an

incident with his wife. (Tr. 1633-34). Plaintiff was discharged the following day

because he claimed his PTSD was being exacerbated by the people and noise at the

hospital. (Tr. 1634). He was diagnosed with PTSD. (Tr. 1636). Plaintiff's medications

were not changed on discharge. (*Id.*).

### D.    Treating Provider Statements

On October 28, 2011, Cannon-Tinder filled out a "Physical Residual Functional

Capacity Questionnaire." (Tr. 1571-75). In it she stated, *inter alia*, that Plaintiff could

sit for about two hours, and stand and/or walk for less than two hours in an eight-hour

workday, and needed a job that allowed him to change positions. (Tr. 1573). She noted

Plaintiff's diagnoses as PTSD, polyarthritis, cervical pain, and right hip pain. (Tr. 1571).
Plaintiff would occasionally experience pain severe enough to interfere with his ability to
maintain attention and concentrate on work tasks. (Tr. 1572). Cannon-Tinder stated that
Plaintiff could occasionally lift and carry up to 20 pounds, could frequently twist, look
down, and hold his head in a static position, could rarely turn his head left or right or
climb stairs, and could never look up, stoop, crouch, squat, and climb ladders. (Tr. 1573-
74). Cannon-Tinder also noted that Plaintiff would have to take two five-minute breaks
per hour. (Tr. 1573).

On June 27, 2012, Staff Psychiatrist Hillary Tzetzo completed a VA PTSD
Benefits Questionnaire in which she, *inter alia*, diagnosed PTSD, found that Plaintiff's
substance abuse was secondary to his PTSD, and assessed a GAF score of 37 due to
PTSD. (Tr. 1557-68). Dr. Tzetzo, after an in-person examination with Plaintiff, stated
that Plaintiff's PTSD was "severe." (Tr. 1557-58). Plaintiff's PTSD stemmed from
exposure to traumatic events during his combat deployment. (Tr. 1563-64). Plaintiff was
also noted to have "ongoing chronic . . . physical problems." (Tr. 1559). He expressed
frustration that he had previously been denied VA disability benefits for PTSD. (*Id.*).
Dr. Tzetzo noted another treating physician's explanation that Plaintiff was previously
denied "due largely to his [history] of some comorbid cocaine use." (Tr. 1561). Dr.
Tzetzo interpreted Plaintiff's substance abuse as self-medication of PTSD symptoms.
(Tr. 1567).

Dr. Tzetzo stated that Plaintiff had "[o]ccupational and social impairment with
deficiencies in most areas, such as work, school, family relations, judgment, thinking

- 19 -

and/or mood." (Tr. 1560). Plaintiff's PTSD manifested in: depressed mood; anxiety; suspiciousness; panic attacks; sleep impairment; flattened affect; impaired judgment; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; impaired impulse control; and intermittent inability to perform activities of daily living. (Tr. 1566).

Dr. Tzetzo stated that Plaintiff was "deserving" of VA disability benefits. (Tr. 1567).

### E.   State Agency Opinions

On November 29, 2011, State agency psychological consultant Dr. C. Butensky reviewed the available evidence of record and concluded that the record contained "insufficient evidence . . . to establish the presence of a psychiatric impairment which would preclude the mental ability to perform competitive work in the time interval between the claimant's alleged onset date and the date last insured." (Tr. 762). Plaintiff's records at the time failed to include any medical evidence of psychiatric impairments or a mental status exam. (*Id.*).

On April 12, 2012, State agency medical consultant Robert Hughes, M.D., reviewed the available evidence of record and concluded that Plaintiff's alleged physical impairments were non-severe as of his date last insured. (Tr. 767).

On May 8, 2012, State agency psychological consultant Paula Kresser, Ph.D., reviewed the available evidence and found that, as of Plaintiff's date last insured, Plaintiff's "primary problem is substance abuse with minimal motivation for treatment."

- 20 -

(Tr. 768). Plaintiff had shown only "mild symptoms from [PTSD] with no medication indicated." (*Id.*). In so finding, Dr. Kresser concluded that Plaintiff had no restriction in his activities of daily living, mild difficulties maintaining social functioning and concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 777).

## III.   The Commissioner's Decision Regarding Disability

### A.   Determining Disability Under the Social Security Act

For both Social Security Insurance and DIB, the Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002).  The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The five steps are as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

## B.    Summary of the ALJ's Decision

In applying the five-step sequential evaluation in this matter, ALJ McDougall made the following determinations. First, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2011. (Tr. 12). At step one of the evaluation, the ALJ found that Plaintiff had not engaged in substantial

gainful activity between December 1, 2008, the amended alleged onset date, and the date last insured. (*Id.*).

At step two, the ALJ found that Plaintiff suffered from severe impairments, including: "status post hip replacement; leg length discrepancy; osteoarthritis; post-traumatic stress disorder; . . . and depression." (*Id.*). The ALJ noted that Plaintiff had a "long history of drug and alcohol abuse" but that Plaintiff's substance abuse was in remission. (*Id.*). Even when active, Plaintiff's addiction issues caused little additional functional limitations on his ability to work, so the ALJ found Plaintiff's substance abuse to be non-severe. (Tr. 12-13). The ALJ also found Plaintiff suffered from non-severe tinnitus, high blood pressure, and eczema. (Tr. 13).

At step three, the ALJ found that none of Plaintiff's severe impairments, alone or in combination, qualified as an impairment listed in Appendix 1. (Tr. 14-16).

Because Plaintiff's severe impairments failed to meet the standards of a listing under Appendix 1, ALJ McDougall assessed Plaintiff's Residual Functional Capacity ("RFC") in step four of the sequential analysis. (Tr. 16-28). The ALJ found that Plaintiff:

> [H]ad the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he cannot climb stairs or ramps. He must be able to change position briefly at least every half-hour. [Plaintiff] cannot work with the general public and can have no more than occasional contact with supervisors. He can have frequent contact with coworkers or peers. [Plaintiff] has the ability to occasionally balance, stoop, kneel, crouch or crawl. He cannot work a job that requires prolonged walking or standing (*i.e.*, more than a half-hour, but he may duplicate the change of position limit).

(Tr. 16). In making his RFC determination, the ALJ followed a two-step process. First, the ALJ "determined whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce [Plaintiff's] pain or other symptoms." (*Id.*). Then the ALJ assessed the intensity, persistence, and limiting effects of Plaintiff's symptoms, and made findings of credibility "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence . . . ." (*Id.*).

At RFC step one, ALJ McDougall found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (Tr. 17). However, at RFC step two, he found that the statements regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms were not credible. (*Id.*).

The ALJ found little objective medical evidence to substantiate Plaintiff's claimed impairments. (*See* Tr. 18-22). There were no treatment records for Plaintiff's claimed neck, back, hip, and shoulder pain prior to Plaintiff's last insured date, and only minimal records after the last insured date. (Tr. 18). Plaintiff went to an emergency room in August 2011, complaining of neck and back pain, which was treated with ibuprofen and prednisone. (*Id.*). Neck x-rays in May 2012 revealed "moderate degenerative disc disease at C4-C5, C5-C6, and C6-C7, bilateral intervertebral foramina narrowing from C4 to C7 on the right and from C5 to C7 on the left, but there was no evidence of any fractures or other abnormalities." (*Id.*). There were no treatment records for November 2012 through January 2014. (*Id.*). ALJ McDougall noted a January 2014 hip x-rays

which showed "mild degenerative changes," and a neck CT scan which had shown "minimal progressive changes" since a November 2010 scan. (*Id.*).

The ALJ noted that though Plaintiff's records showed a leg length discrepancy, treating physicians reported that the discrepancy did not affect Plaintiff's gait. (*Id.*). X-rays of Plaintiff's ankles "showed some calcification, but nothing of any significance," and it was recommended that Plaintiff use a lift in his shoes and a straight cane. (*Id.*).

Turning to Plaintiff's mental capacity, the ALJ stated that "there is little to no treatment for any mental impairment other than substance abuse prior to or after [Plaintiff's] alleged onset date." (Tr. 19). Plaintiff had complained of only "mild PTSD symptoms" before the alleged onset date. (*Id.*). Screenings for depression in 2006 and 2007 did not show any significant symptoms, and there were no records showing treatment before the alleged onset date. (*Id.*).

ALJ McDougall found that there were no treatment records for Plaintiff's mental health issues between the alleged onset date (December 1, 2008) and the date last insured (June 30, 2011). (*Id.*). According to the ALJ, Plaintiff had "some treatment" for PTSD and depression after the date last insured, "but not much." (*Id.*).

The ALJ noted Plaintiff's March 5, 2012 admission for PTSD, substance abuse, and rule out major depressive disorder, and Plaintiff's May 8, 2012 hospitalization for an adjustment disorder, depressed mood, and rule out PTSD. (*Id.*). Plaintiff had reported nightmares, feelings of depression and guilt, hopelessness, and helplessness. (*Id.*). Plaintiff had denied suicidal ideation. (*Id.*). ALJ McDougall highlighted the admitting psychiatrist's statement that "it was not clear that the claimant presented the full range of

PTSD symptoms . . . ." (Tr. 20). Medical staff at the hospital had noted Plaintiff's trauma seemed to stem more from Plaintiff's childhood abuse than his military service. (*Id.*). The ALJ observed that, shortly thereafter, the VA denied Plaintiff's request to join another in-patient PTSD program because "it was not clear that [Plaintiff] had PTSD . . . ." (*Id.*). The ALJ states that Plaintiff was admitted to another program on January 9, 2013 and diagnosed with PTSD. (*Id.*).

The ALJ then highlighted the lack of treatment records from January 2013 through February 2014. (Tr. 21.) Plaintiff was again admitted on February 10, 2014, and diagnosed with an adjustment disorder. (*Id.*). The ALJ noted that Plaintiff "did not exhibit any signs of depression." (*Id.*).

The ALJ then described his reasoning for discounting Plaintiff's subjective complaints. ALJ McDougall found that although severe pain was alleged, there was a lack of persistent treatment in the medical record for pain. (*Id.*). Because of Plaintiff's "poor work history" there was "no favorable inference of an individual well motivated to work." (Tr. 22). Plaintiff's inconsistent statements also undermined his credibility in the ALJ's eyes. (*Id.*). There were multiple inconsistent statements relating to prior suicide attempts, and despite claims of numerous fractures, there were no treatment records to support those claims. (*Id.*). Plaintiff's statements regarding his history of alcohol and drug abuse were inconsistent with medical records. (Tr. 22-24). The ALJ also stated that Plaintiff's convictions for burglary and larceny—"crimes . . . involving moral turpitude"—further undermined Plaintiff's credibility. (Tr. 24).

ALJ McDougall addressed Plaintiff's 100 percent disabled rating by the VA. Because the Social Security Administration used different criteria to evaluate disability, a ruling by the VA of "disabled" "does not coincide with a determination of disability for Social Security disability." (Tr. 25).

Turning to the medical opinions, the ALJ first addressed Cannon-Tinder's opinion. (Tr. 25-27). Cannon-Tinder's opinion was given "little weight," not controlling weight, because, as a nurse practitioner, she was not an acceptable medical source for purposes of Social Security regulations. (Tr. 25). The ALJ further found that Cannon-Tinder's assessment of Plaintiff's severe limitations was not consistent with prior treatment, objective findings, and Plaintiff's activities. (Tr. 26). ALJ McDougall specified that Cannon-Tinder's statement that Plaintiff could not walk for more than one or two minutes, and could never look up, stoop, crouch, or crawl were given little weight because there was little-to-no treatment for those issues, especially before the date last insured. (Id.). Cannon-Tinder's assessment regarding Plaintiff's ability to lift, the time he could stand, and his need to change positions frequently was given greater weight because it was consistent with the medical records. (Tr. 27).

The ALJ gave some, but not great, weight to Plaintiff's GAF scores. (Id.). All of the GAF scores were rendered after the last insured date, and they were based, in part, on Plaintiff's drug and alcohol abuse combined with mental health issues. (Id.).

State consultant Robert Hughes, M.D.,'s opinion that Plaintiff had "no severe impairment" was given little weight because it was not consistent with the objective medical records, and because Dr. Hughes never examined Plaintiff. (Tr. 27-28).

- 27 -

The opinion of Paula Kresser, Ph.D., another state consultant, was given some weight, but "not much weight on the issue of social functioning" because Dr. Kresser did not examine Plaintiff and failed to consider Plaintiff's subjective complaints regarding PTSD. (Tr. 28).

The ALJ found that Plaintiff had no past relevant work. (*Id.*). Plaintiff was 45 years old, had a high school education, and could communicate in English. (*Id.*).

At step five of the sequential analysis, the ALJ found, based on the vocational expert's testimony, that there were jobs that exist in significant numbers in the local and national economies for a person with Plaintiff's qualifications and limitations. (Tr. 28-29). Plaintiff could find work consistent with his RFC as a small parts assembler or an inspector. (Tr. 29). The ALJ concluded that Plaintiff was not disabled for purposes of §§ 216(i) and 223(d) of the Social Security Act as of the date last insured. (Tr. 30).

## IV.   Discussion

### A.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting § 405(g)). The Social Security Act directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is "more

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

**B.    The ALJ's Failure to Consider the Entire Record Was Legal Error**

Plaintiff makes two arguments.   First, Plaintiff argues that the ALJ's failure to weigh Dr. Tzetzo's medical opinion was legal error, requiring remand.  (Dkt. 7 at 23-26). Plaintiff then argues that even if the ALJ's failure to weigh Dr. Tzetzo's opinion was not fatal to the Commissioner's determination, Plaintiff's RFC was not based on substantial evidence because the ALJ relied on the non-examining opinions of state agency consultants who did not review all of Plaintiffs records, and ALJ McDougall's "own lay surmise." (*Id.* at 26-33).  The ALJ's failure to weigh Dr. Tzetzo's opinion is legal error. Because this, in itself, requires remand, the Court does not address Plaintiff's second argument.

An ALJ is required to consider every medical opinion received by the Social Security Administration, and to review all available evidence.  20 C.F.R. § 404.15278(c); *Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012).   The medical opinion of a treating source is generally entitled to "controlling" weight.  20 C.F.R. § 404.1527(c). An ALJ must weigh certain factors in evaluating both treating and non-treating source statements,  including  the  nature,  length,  and  extent  of  the  treating  or  examining relationship, as well as whether the medical opinion is supported by, and consistent with, medical signs and laboratory findings.  *Id.*  An ALJ "is not permitted to substitute his own expertise or view of the medical proof . . . for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).   Remand is required when an ALJ errs by failing to adequately evaluate the weight of a medical opinion in light of the factors set forth in 20 C.F.R. § 404.1527(c).  *See, e.g.*, *Evans v. Colvin*, No 15-2569-CV, 2016 WL

2909358, at *3 (2d Cir. May 19, 2016); *Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015). "Such an error . . . requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010); *see, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

Here, Dr. Tzetzo's opinion regarding Plaintiff's PTSD was significantly more favorable to Plaintiff than other medical source opinions, yet the ALJ did not weigh, or even mention, Dr. Tzetzo's opinion in his decision. (*See* Tr. 9-30). The Social Security regulations required ALJ McDougall to provide reasons as to why Dr. Tzetzo's opinion was not provided any weight in his determination. *See* 20 C.F.R. § 404.1527(c). The ALJ erred in failing to do so.

The Commissioner argues that the ALJ's failure to address Dr. Tzetzo's opinion is, at most, harmless error. (Dkt. 10 at 14-15). The Commissioner relies on *Zabala*, 595 F.3d 402 (2d Cir. 2010), for the proposition that if the application of the correct legal principals would lead to the same outcome, the ALJ's error is harmless and remand is inappropriate. (Dkt. 10 at 14-15). In *Zabala*, the ALJ failed to consider a "second, virtually identical opinion by the same treating physician." *Greek*, 802 F.3d at 376; *see, e.g.*, *Zabala*, 595 F.3d at 409 ("Here . . . the excluded evidence is essentially duplicative of evidence considered by the ALJ."). The ALJ's failure in this case is unlike that in *Zabala*. The evidence ALJ McDougall failed to consider is not "virtually identical" or "essentially duplicative" of other evidence in the record. Dr. Tzetzo's statement is

significantly more favorable to Plaintiff than other opinions in the record. The ALJ's failure to address this opinion was not harmless.

"On remand, the ALJ might conclude that [Dr. Tzetzo's] opinion is not entitled to any weight, much less controlling weight, but that determination should be made by the agency in the first instance . . . ." *Lesterhuis*, 805 F.3d at 88.

## V.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 10) is denied, the Plaintiff's motion for judgment on the pleadings (Dkt. 7) is granted in part, and the matter is remanded for further proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 22, 2016
        Rochester, New York